CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

OCT 25 2022

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
       DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
| ) | |
| v.                          ) | Criminal No.: 4:21-cr-009 |
| ) | |
| CHAUNCEY LAMONT             ) | |
| MONTAGUE,                   ) | By: Michael F. Urbanski |
|      Defendant.             ) | Chief United States District Judge |

**MEMORANDUM OPINION**

Chauncey Montague's three count indictment charges him with two violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c) (distribution of a substance containing fentanyl that resulted in the death of an A.R. after two previous drug convictions and possession with the intent to distribute fentanyl) and one violation of 18 U.S.C. §§ 922(g)(1) (felon in possession of a firearm). Chauncey Montague's ("Montague") jury trial is scheduled to begin February 6, 2023. Montague filed a motion to suppress all statements made by him to law enforcement after his arrest on October 24, 2019. ECF No. 28. Montague argues that his incriminating statements made to police were not voluntarily given and instead were illegally coerced by police. The issues were fully briefed by the parties and the court viewed the video recording of Montague's questioning. The court heard argument on the motion to suppress on September 12, 2022. ECF No. 41. For the reasons stated on the record and detailed in this opinion, Montague's motion to suppress is **DENIED**.

   I.   Facts

On October 24, 2019, Danville Police Officers took Montague into custody after searching his residence pursuant to a warrant and discovering eight grams of a substance later

1

determined to be a fentanyl mixture in a jacket pocket on the premises. Montague was transported to the Danville Police Department and placed in an interrogation room where all actions were recorded by a camera in the room. ECF No. 28-1 at 1. Police officers questioned Montague on the source of the drugs recovered from his home because they were intent on determining whether his drugs were related to others that had caused multiple overdoses and at least one death in the Danville area. Resp. to Mot. to Suppress, ECF No. 32 at 3.

Video footage of the entire encounter shows Montague conversing with police and given opportunities to sleep at points within the interrogation. Detective Lancaster advised Montague of his Miranda rights at the 1:50 mark in video 000 and Montague responded with a nod and "yes sir" when asked if he understood his rights Id. Detective Lancaster did not have Montague sign a waiver after receiving oral confirmation that he understood his Miranda rights. The detectives thereafter proceeded to question Montague for the next half hour but Montague made no meaningful admissions about the source of the fentanyl recovered from his home. Id. Montague did inform the officers that he had earlier taken heroin, which was evidenced by some residue present around his nose. ECF No. 28-1 at 1.

During the interrogation and after admitting to his use of heroin, the officers became concerned for Montague's health and called medics from the fire department to come check on him. Id. When they arrived, the medics checked Montague's vitals, asked him if he was a regular user, and, after evaluating him, chose not to transfer him to the emergency room for further evaluation. Id.

Montague stayed in the interrogation room until he was woken up by Captain Richardson for continued interview. Id. at 2. He was not reread his Miranda warnings at the

time of this interview period but appeared coherent and responsive to questions asked during the remainder of his time in custody when he was not asleep. During Montague's time detained and interviewed, which lasted approximately eight hours, the government provided him with restroom breaks, two meals, a blanket because he said he was cold, and the opportunity to sleep as needed. ECF No. 32 at 3-4. Although Montague did not object to his questioning by police or request counsel, he now seeks to suppress the statements he made during the course of his detention by police.

## II. Law and Analysis

"Miranda held that once given the now familiar warnings of his rights under the fifth and sixth amendments, a suspect could 'waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.'" United States v. Smith, 608 F.2d 1011, 1012 (4th Cir.1979) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). The inquiry into whether an individual waived effectuation of the rights conveyed in the Miranda warnings has two distinct dimensions." United States v. Cristobal, 293 F.3d 134, 139 (4th Cir.2002). "First, the relinquishment of the right 'must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception.'" Id. at 139 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). Second, in addition to being voluntary, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. at 140. The determination of whether a Miranda waiver is voluntary, knowing, and intelligent is done by examining the totality of the circumstances surrounding it. "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of

comprehension may a court properly conclude that the Miranda rights have been waived." Moran, 475 U.S. at 421.

The voluntariness of a waiver depends on "the absence of police overreaching, not on 'free choice' in any broader sense of the word." Colorado v. Connelly, 479 U.S. 157, 170 (1986). A defendant's "incriminating statement is deemed involuntary only if induced by such duress or coercion that the suspect's 'will has been overborne and his capacity for self-determination critically impaired.'" United States v. Locklear, 829 F.2d 1314, 1317 (4th Cir. 1987). "To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider the 'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." Cristobal, 293 F.3d at 140 (quoting United States v. Pelton, 835 F.2d 1067, 1072 (4th Cir. 1987)). Factors considered in this determination include "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

Both implied and express waiver of Miranda rights are recognized in the Fourth Circuit. Waiver can be implied through showing a defendant's "subsequent willingness to answer questions after acknowledging [his] Miranda rights." United States v. Frankson, 83 F.3d 79, 82 (4th Cir. 1996) (quoting United States v. Velasquez, 626 F.2d 314, 320 (3d Cir. 1980)).

In the Fourth Circuit, the test of whether a person is too intoxicated or affected by alcohol or other drugs to voluntarily and intelligently waive his Miranda rights is one of

4

coherence and the ability to understand what is happening. United States v. Smith, 608 F.2d 1011, 1012 (4th Cir. 1979); see United States v. Sledge, 546 F.2d 1120, 1122 (4th Cir. 1977) (finding that waiver was voluntary and knowledgeable despite confirmation that defendant had used drugs prior that day); see United States v. Martin, 434 F.2d 275, 279 (5th Cir. 1970) (evidence was admitted despite defendant's use of alcohol because it was determined that his facilities were not impaired to a point of not understanding what was going on). "The Government has the burden of proving, by a preponderance of the evidence, that the defendant's waiver of his Miranda rights was knowing and voluntary." United States v. Robinson, 404 F.3d 850, 859 (4th Cir. 2005).

Montague's argument and recitation of the incident, asserting that his statements were coerced and any waiver he made was involuntary because his heroin use rendered him intoxicated, he displayed slurred speech, and he spent significant time alternating between sleeping and consciousness, does not comport with the video footage. In the video, Montague did not slur his speech when awake and conversing with officers. He alertly followed along with the officer's questioning and the officer's recitation of his Miranda rights. Additionally, while the court recognizes the officers and investigators aggressively questioned Montague, the officers did not prevent him from sleeping, jerk him awake, cause deliriousness, or impact his ability to think when he arrived at the interrogation room and during the time he was held there. The officers' aggressive tone was traceable to the circumstances surrounding the fentanyl emergency in Danville and the potential deaths tied to it. Assessing the overall situation, law enforcement did not act coercively toward Montague because the totality of the

5

circumstances demonstrate that Montague was provided ample opportunity to rest, eat, and gather himself, albeit in a confined place, during his questioning.

Additionally, despite Montague's argument that his prior drug use rendered his waiver involuntary, Sledge and Martin demonstrate that his waiver's voluntariness rested on whether he understood what was going on when he waived his rights. The video demonstrates that Montague was consciously present and not intoxicated to the extent that his waiver of his Miranda rights was ineffectual. The video shows that Montague was visually alert and replied "yes sir" when the officer asked if he understood his rights. After officers read Montague his Miranda rights, his decision to talk to the officers effectuated a waiver of those rights. See Frankson, 83 F.3d at 82. Furthermore, his alertness was demonstrated when he was asked if he knew the current date and time and he responded with an accurate answer. Given all these details regarding his alertness and responsiveness, the court concludes that Montague understood what was going on, validly waived his Miranda rights by speaking with law enforcement, and his statements are admissible.

### III.    Conclusion

For the foregoing reasons stated within this opinion and on the record at the September 12, 2022, hearing, Chauncey Lamont Montague's motion to suppress, ECF No. 28, is **DENIED**.

An appropriate Order will be entered.

Entered:    October 24, 2022

Digitally signed by Michael F. Urbanski Chief U.S. District Judge
Date: 2022.10.24 11:18:09 -04'00'

Michael F. Urbanski
Chief United States District Judge

7